# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

KEVIN W. CURRYTTO,
      *Plaintiff*,

      v.

DOE, *et al.*,
      *Defendants*.

No. 3:18-cv-01392 (JAM)

## INITIAL REVIEW ORDER PURSUANT TO 28 U.S.C. § 1915A

Plaintiff Kevin Currytto is a sentenced prisoner in the custody of the Connecticut

Department of Correction. He has filed this action *pro se* and *in forma pauperis* alleging that

prison officials were deliberately indifferent to his nutritional needs, discriminated against him

on the basis of his disabilities, and retaliated against him for attempting to protect his rights.

After an initial review under 28 U.S.C. § 1915A, the Court concludes that Currytto's

claims for a violation of the Eighth Amendment, the First Amendment, the Americans with

Disabilities Act ("ADA"), the Rehabilitation Act, and state law negligence may proceed against

some of the defendants.

### BACKGROUND

Currytto is incarcerated at Osborn Correctional Institution. He has amended his complaint

several times. *See* Docs. #14, #16, #18, #21, and #23. The operative complaint now names the

Connecticut Department of Correction ("the Department") and 37 corrections officials in their

individual and official capacities: Commissioner Scott Semple, Wardens Fanueff and Wright,

Counselor Supervisors Long and Derby, Captains Chapdelaine and Manning, Lieutenants

Grimaldi and Maeli, District Administrator Angel Quiros, Officers Nothie, Horn, Talaga, Eason,

Acanto, Moore, Peart, Morgenstein, Sanchez, Williams, Cyr, Grant, and Murphy, and social

1

worker Matthew Clarke, along with four John Doe lieutenants, one John Doe warden, seven John Doe officers, and one John Doe captain. Doc. #23. Currytto seeks damages and injunctive relief. *Id.* at 7, 53.

The following facts as alleged in the operative complaint are accepted as true only for purposes of this ruling. On September 26, 2017, Currytto was transferred to Osborn Correctional Institution and placed in the "G" block mental health unit (MHU). Doc. #23 at 9. Currytto suffers from a delusional disorder, schizoaffective-depressive disorder, bipolar disorder, and a substance abuse disorder. *Id.* at 9-10, 68 (medical records). He remained in MHU until December 27, 2017, when he was transferred to the general population unit and then to the addiction services unit, called "J" unit. He was transferred out of J unit temporarily due to discipline issues, then returned to the unit on June 16, 2018. *Id.* at 31-32. J unit is designed to "promot[e] change through a[] highly structured and disciplined framework," and requires a higher level of compliance from inmates than other units. *Id.* at 34-35.

First in MHU and then in J unit, Currytto was given less than five minutes to eat most of his meals. From September 27 to November 11, 2017, MHU was the last unit to enter the dining hall, and Currytto and other inmates in the unit were allowed only five minutes to eat their lunch and dinner. *Id.* at 29. This policy for inmates on the MHU was "corrected" by the defendants on November 11, 2017. *Id.* at 30. Yet again from June 16 to October 24, 2018, while he was in the J Unit, Currytto's unit ate last and he was again subject to a policy that allowed him only a few minutes to eat lunch and dinner. *Id.* at 35. Being last to eat meant that he and the other inmates in his unit had only 2-5 minutes "to be served, seated and completed with [a] meal" before defendants called "mass movement" and began ushering inmates out of the dining hall. *Id.* at 42; *see also id.* at 63-65 (declarations from two other inmates in J unit regarding mealtime practices).

Currytto alleges that this "kickout" policy resulted in him regularly having to throw away unfinished meals. *Ibid.*; *see also id*. at 12, 17. Currytto successfully lobbied for the kickout practice to end when he was housed in MHU, only to find that J unit had simply been swapped into the last place meal slot. *Id.* at 29-30, 32, 41.

Currytto has no upper or lower molars in his mouth and cannot eat quickly due to a choking hazard. *Id.* at 29*; see also id.* at 67 (dental records showing missing teeth). Having so little time to eat prevented him from finishing his food and deprived him of adequate nutrition. *Id.* at 30, 43. He "experienced weight loss, fatigue, dizziness, hunger pains, [and] sleeplessness." *Id*. at 31. The situation also caused him to develop digestive problems that require medication. The digestion problem "creates pain at his heart" and "aggravates his mental disability by creating delusional thinking about what['s] going on with his body." *Id*. at 43. Having to eat so quickly also increased his anxiety. *Id.* at 45. On January 31, 2018, in between Currytto's time in MHU and J Unit, the prison doctor put him on a high calorie/high protein diet "to address his weight loss issues." *Id.* at 31.

Currytto alleges that Osborn's inmate handbook instructs inmates that "you will have 20 minutes to eat your meal," but that defendants "do not follow the[i]r own dining hall regulations." *Id*. at 36; *see also id*. at 10. In allowing less time, Currytto alleges that the defendants are driven by self-interest, indifference, and/or gross negligence. *Ibid.* They "are attempting to cycle through housing units at dining hall in less time than the duty of feeding the population requires" in order to "ease the workday/shift/duty requirement of feeding the inmate population." *Id.* at 44. Defendants "purposely placed the MHU with plaintiff as the last housing unit to be released for chow to the dining hall due to the fact that the MHU's population is disabled . . . manageable, yielding, malleable, decomposed, [and] deteriorated." *Id.* at 13.

Inmates in J unit were also an easy target for being forced to eat last. They are more compliant than inmates in other units because J unit has an enhanced rule structure and "it is easy to be removed from [the unit] due to non-compliance." *Id.* at 40.

Williams, Murphy, Grant, Morgenstein, Cyr, Peart, Sanchez, Nothie, Horn, Talaga, and John Doe Officers were posted in the dining hall and monitored inmates' meals, on a rotating basis according to duty assignments. *Id.* at 10-11, 23, 35-36. Grimaldi, Manning, Chapdelaine, Maeli, and/or John Doe Lieutenants were posted in the hallway outside the dining hall door, supervising the officers within. *Id.* at 11, 35-36. The officials stationed outside the door would "open security door and signal for inmate population within dining hall to 'mass move,'" signaling the end of the meal, at which point the officers within would begin ushering inmates out of the dining hall. *Id.* at 11-12. "These defendants supervise or functionally operate" the meal procedures, including the feeding of inmates and the timing of the end of the meal. *Id.* at 36. Currytto alleges that Wright and Quiros were "on notice of the dining hall issue . . . and failed to make necessary adjustments." *Id.* at 34, 41. Between May and July 2018, Currytto saw them observing dining hall operations through the window. *Id.* at 34.

Inmates in other units were not subjected to the kickout practice. While Currytto "attempt[ed] to eat his meal in 2-5 minutes," "[o]ther housing units in dining hall are given adequate time to complete meals, have eaten, socialized, deposited empty trays at scullery, returned to tables and are awaiting for the security door to open" signaling the end of the meal. *Id.* at 43-44. Other units get "15 minutes or more" to eat, *ibid,* but Currytto was deprived of the benefits "of the nutritional program offered to the inmate population because of his mental disability, impairment, and housing in a[] mental health unit." *Id.* at 21. Currytto also alleges that MHU inmates were forced to wear a "half light blue/half pink identification badge" that is

"designed to indicate that the wearer of the badge/I.D. is 'off,' 'impaired,' [and] 'disabled.'" *Id.* at 26-27.

Currytto alleges that he made several attempts to stop the kickout practice and was retaliated against for doing so. *Id.* at 7. On October 12, 2017, he told Murphy, who was posted in the dining hall, that he was "not being allowed to complete his meals." *Id.* at 18; *see also id.* 16-17. Murphy told him to "tell them when you get out," referring to Grimaldi, who was stationed outside the dining hall supervising the meal. *Id.* at 18. Another officer, Grant, overheard the conversation and stated "oh, this is the spokesperson for [MHU] in a[] humiliating and guarded manner." *Id.* at 19. Currytto felt he was being discriminated against, and that calling him a "spokesperson" was identifying him as a security risk group member or threatening discipline. *Id.* at 19-20. Williams and "2 or 3" other John Doe corrections officers witnessed the exchange, and their presence and laughter made Currytto feel threatened. *Id.* at 19-20. Grimaldi was in the vicinity while this happened but "failed to act in any manner to determine what was taking place . . . or what the plaintiff was complaining about." *Id.* at 23.

Currytto next spoke with Matthew Clarke, a social worker and his therapist within the unit. *Id.* at 23. Currytto told Clarke about the problem but Clarke took no action to address it. That same day, Currytto filed an administrative remedy request, which a John Doe officer forwarded to Counselor Supervisor Long, who forwarded it to Captain Chapdelaine. Neither of them fixed the problem. *Id.* at 24.

On October 29, 2017, while his administrative remedy request was being processed, Officer Cyr ordered Currytto to leave the dining hall "in an affrontive and disgruntled manner" even though other inmates in his unit were still seated and eating. *Id.* at 25-26. Grant was at the

door and closed it on Currytto as he attempted to exit. *Id.* at 26-27. Currytto alleges that Grant and Cyr were punishing him for filing a grievance.

Following this incident, Currytto filed a second administrative request with Long, alleging that Grant and Cyr were targeting him for his past complaints. *Id.* at 28. After he filed this request, "numerous officers," including Grant, Williams, Murphy, and "John Doe(s) 2 or more" began intimidating him while he walked down the hallway to and from the dining hall. They would stare at him, shake their keys, and call him a sex offender. *Id.* at 28. On September 8, 2018, after he had filed his complaint in federal court, Grimaldi stopped by J unit to "dig" him, and Grimaldi and Eason deliberately gave Currytto only two minutes to eat "in exchange for plaintiff filing [the] complaint." *Id.* at 47.

Currytto then filed various grievances that were processed by Derby, Moore, Acanto, Manning, Chapdelaine, Wright, and Quiros. *Id.* at 47-51. None of them intervened to fix the problem, and Quiros "reinterpreted the evidence submitted to him" in order to cover up "the practice failures in [the] dining hall." *Id.* at 51.

Currytto also alleges that Acanto, who is the prison's Freedom of Information Act officer, would not grant his requests for videos of mealtimes until he reduced the scope of his requests. *Id.* at 46, 50. Acanto told Currytto that his request to preserve the video footage of two weeks' worth of lunches and dinners was excessive and pressured him to limit the request, which he did. *Id.* at 46, 49. Acanto was attempting to "stage him out" and provide him with only the "bare minimum ability [] to prove his case of being denied food in the dining hall." *Ibid.* Acanto has granted other inmates' video requests without claiming that the requests were excessive. *Ibid.*

Finally, Currytto alleges that the kickout policy threatened his physical safety, as did the physical conditions in the dining hall. He states that defendants' practice of releasing up to three units worth of inmates from the dining hall at a time posed a safety hazard and violated the facility handbook, which states that "you must leave the dining hall 'when *your unit* is called.'" *Id.* at 37 (emphasis in original). Currytto interprets the handbook to mean that only one unit may be called at a time. *Id*. at 37. There are also physical hazards in the dining hall: exposed lightbulbs with no safety shield covers, wet floors, holes in window screens that birds fly through, "dirty tables with a[] film of food bacteria on them," and a dishwasher that "doesn't heat water to temperature sufficient to sanitize food trays," among other problems. *Id.* at 44.

Currytto claims that defendants violated his rights under the First and Eighth Amendments to the United States Constitution, Title II of the Americans with Disabilities Act, § 504 of the Rehabilitation Act, and Connecticut state law. He seeks monetary and injunctive relief.

## DISCUSSION

Pursuant to 28 U.S.C. § 1915A, the Court must review a prisoner's civil complaint against a governmental entity or governmental actors and "identify cognizable claims or dismiss the compliant, or any portion of the complaint, if the complaint—(1) is frivolous, malicious, or fails to state a claim upon which relief may be granted; or (2) seeks monetary relief from a defendant who is immune from such relief." If the prisoner is proceeding *pro se*, the allegations of the complaint must be read liberally to raise the strongest arguments that they suggest. *See Tracy v. Freshwater*, 623 F.3d 90, 101-02 (2d Cir. 2010).

In recent years, the Supreme Court has set forth a threshold "plausibility" pleading standard for courts to evaluate the adequacy of allegations in federal court complaints. A

complaint must allege enough facts—as distinct from legal conclusions—that give rise to plausible grounds for relief. *See, e.g.*, *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Notwithstanding the rule of liberal interpretation of a *pro se* complaint, a *pro se* complaint may not survive dismissal if its factual allegations do not meet the basic plausibility standard. *See, e.g.*, *Fowlkes v. Ironworkers Local 40*, 790 F.3d 378, 387 (2d Cir. 2015).

As a threshold matter, I will dismiss as moot all claims for injunctive relief because Currytto represents that the kickout practice ended on July 27, 2018. I will also dismiss all § 1983 claims for money damages against defendants in their official capacities. State officials sued in their official capacities under § 1983 are immune from suit for damages pursuant to the Eleventh Amendment. *See Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100 (1984) (agencies and departments of the state are entitled to assert the state's Eleventh Amendment immunity); *Davis v. New York*, 316 F.3d 93, 101 (2d Cir. 2002) (state, state agencies, and prison officials in their official capacities have Eleventh Amendment immunity from suit seeking monetary damages in § 1983 civil rights action). I will also dismiss Currytto's money damages claims against the DOC for violations of his constitutional rights. The DOC is a state agency and is not considered a person within the meaning of § 1983. *See Will v. Mich. Dep't of State Police*, 491 U.S. 58, 70-71 (1989).

### *Deliberate indifference to serious medical need*

The Eighth Amendment prohibits prison officials from being deliberately indifferent to the serious medical needs of prisoners in their custody. *See Estelle v. Gamble*, 429 U.S. 97, 104 (1976). A prisoner who claims deliberate indifference to a serious medical need must satisfy two requirements. First, there is an objective requirement: that the prisoner's medical need was

sufficiently serious (*i.e.*, that the prisoner suffered from an urgent medical condition involving a risk of death, degeneration, or extreme pain). *See Spavone v. N.Y. State Dep't of Corr. Servs.*, 719 F.3d 127, 138 (2d Cir. 2013); *Hill v. Curcione*, 657 F.3d 116, 122 (2d Cir. 2011). Second, there is a subjective requirement: that the defendant have acted recklessly, *i.e.*, with an actual awareness of a substantial risk that serious harm to the prisoner would result from the defendant's action or non-action. *See Spavone*, 719 F.3d at 138. It is not enough to allege simple negligence; instead, a prisoner must show that the defendant acted with the equivalent of a criminally reckless state of mind with respect to the prisoner's medical needs. *See Hilton v. Wright*, 673 F.3d 120, 122-23 (2d Cir. 2012); *Collazo v. Pagano*, 656 F.3d 131, 135 (2d Cir. 2011) (*per curiam*).

Beginning with the objective prong, it is well established that prisoners have the right to food as a basic life necessity. "There is no static test to determine whether a deprivation is sufficiently serious" to violate the Eighth Amendment; rather, "the conditions themselves must be evaluated in light of contemporary standards of decency." *Jabbar v. Fischer*, 683 F.3d 54, 57 (2d Cir. 2012). "Under certain circumstances a substantial deprivation of food may well be recognized as being of constitutional dimension." *Robles v. Coughlin*, 725 F.2d 12, 15 (2d Cir. 1983).

Currytto's allegation that he had fewer than five minutes to collect his food, sit down, and eat it, and that this caused him regularly to throw away uneaten food, is sufficient to plausibly allege that he was being deprived of adequate nutrition, particularly in light of his allegations concerning his inability to eat quickly because of missing molars. *See, e.g.*, *Williams v. Del. Cty. Bd. of Prison Inspectors*, 2018 WL 4558190, at *9 (E.D. Pa. 2018) (finding plaintiff's allegations that defendants deprived him of five meals over four days sufficient to allege an Eighth

Amendment violation); *Banks v. Annucci*, 48 F. Supp. 3d 394, 407 (N.D.N.Y. 2014) (same for allegations that defendants tampered with plaintiff's food for four days); *Chappell v. Pliler*, 2017 WL 363002, at *18-*19 (plaintiff's allegation that he was only fed two meals per day survives summary judgment on the grounds that there was a genuine issue of fact as to how much food plaintiff received, and that allegations that he suffered stomach pain and dizziness sufficed to show actual injury from nutritional deprivation), *report and recommendation adopted*, 2017 WL 784996 (E.D. Cal. 2017).

Currytto's very specific allegations regarding the number of meals that lasted less than five minutes, and the fact that missing molars prevent him from chewing food, distinguish his claim from inadequate food claims that have been rejected by other courts in this circuit. *See, e.g.*, *Hankerson v. Nassau Cty. Corr. Facility*, 2012 WL 6055019, at *4 (E.D.N.Y. 2012) (inmate's claim that "he missed a single meal falls far short of a substantial deprivation of food and does not rise to the level of a constitutional deprivation"); *Gill v. Hoadley*, 261 F. Supp. 2d 113, 129 (N.D.N.Y. 2003) (denial of one lunch does not state Eighth Amendment claim); *Waring v. Meachum*, 175 F. Supp. 2d 230, 239-40 (D. Conn. 2001) (no Eighth Amendment claim where inmates alleged "that they were left hungry because the quantity of food provided was not sufficient" but did not allege that they "failed to receive three meals a day or that the meals they received were not nutritionally adequate"). Defendants are certainly free to argue at future stages of this proceeding that any deprivation was not severe enough to constitute a constitutional violation, or to raise a qualified immunity defense. But Currytto's allegations suffice at this very initial review stage to satisfy the objective prong of the deliberate indifference inquiry.

As for the subjective prong, Currytto alleges that Williams, Murphy, Grant, Morgenstein, Cyr, Nothie, Horn, Talaga, Peart, Sanchez, and the John Doe officers were posted in the dining

hall during mealtimes. He alleges that Maeli, Grimaldi, Manning, Chapdelaine, and the John Doe lieutenants were posted outside the dining hall during mealtimes and participated in and/or regularly observed the kickout practices. His allegations suffice at this initial review stage to suggest that they deliberately took part in and enforced the kickout policy. I will allow the individual-capacity deliberate indifference to medical needs claim to proceed against Williams, Murphy, Grant, Morgenstein, Cyr, Nothie, Horn, Talaga, Peart, Sanchez, Maeli, Grimaldi, Manning, Chapdelaine, and the John Doe officers and lieutenants.

### *Deliberate indifference to safety*

The two-part inquiry for claims of deliberate indifference to medical need also applies to claims for deliberate indifference to safety. A plaintiff must allege that the harm was objectively serious, and that the charged officials "act[ed] or fail[ed] to act while actually aware of a substantial risk" of that serious harm. *Spavone*, 719 F.3d at 138. Currytto alleges that the kickout practice created a situation where many inmates were leaving the hall at the same time and that this created a safety hazard and violated the facility handbook. Doc. #1 at 37. But he makes no allegations of actual injuries or facts to that suggest there was a serious risk of injury, and a violation of a prison regulation does not necessarily establish that there has also been a violation of the Constitution. *See, e.g.*, *Sandin v. Conner*, 515 U.S. 472, 481-82 (1995); *see also Galarza v. Erfe*, 2019 WL 121784, at *4 (D. Conn. 2019). A federal court complaint may only proceed under 42 U.S.C. § 1983 if it alleges facts that plausibly establish a violation of the U.S. Constitution.

Similarly, Currytto's cursory allegations regarding conditions in the dining hall—birds flying in, bacteria on the tables, exposed light bulbs, and insufficient dishwasher temperatures— do not allege facts that rise to the level of an Eighth Amendment violation. He has not alleged

that any inmates got sick or were injured as a result of the alleged conditions. In the absence of

any details to suggest that inmates' dishes or utensils caused harm, his allegation that the

dishwasher water was not hot enough to clean the dishes is purely conclusory. I will dismiss

Currytto's claims for deliberate indifference to safety.

### Discrimination under the ADA and Rehabilitation Act

Currytto claims that defendants, including the Connecticut Department of Correction,

discriminated against him in violation of the ADA and Rehabilitation Act. "[N]either Title II of

the ADA nor § 504 of the Rehabilitation Act provides for individual capacity suits against state

officials." *Garcia v. S.U.N.Y. Health Sci. Ctr. of Brooklyn*, 280 F.3d 98, 107 (2d Cir. 2001).

Accordingly, I will dismiss Currytto's claims under the ADA and the Rehabilitation Act against

the individual defendants in their individual capacities. Because I have already dismissed

Currytto's claims for injunctive relief as moot and because Currytto has also sued the

Department of Correction, this likewise precludes Currytto from proceeding with his official

capacity claims against individual defendants under the ADA and Rehabilitation Act. *See*

*Tsirelman v. Daines*, 794 F.3d 310, 313 (2d Cir. 2015); *Castanza v. Town of Brookhaven*, 700 F.

Supp. 2d 277, 284 (E.D.N.Y. 2010).

As for Curryto's action against the Department of Correction, the Supreme Court has

held that Title II of the ADA validly abrogates sovereign immunity and permits a private cause

of action for damages against a state or state entity, at least as to conduct that also violates the

Constitution. *See United States v. Georgia*, 546 U.S. 151, 159 (2006); *see also Bolmer v.*

*Oliveira*, 594 F.3d 134, 139 (2d Cir. 2010); *Crosby v. Tawanna,* 2019 WL 1921709, at *5 (D.

Conn. 2019). A plaintiff may also bring an official capacity suit against a state or its agent under

§ 504 of the Rehabilitation Act. *See Super v. J. D'Amelia & Assoc., LLC*, 2010 WL 3926887, at

*13 (D. Conn. 2010) (explaining that Connecticut's continued acceptance of federal funds constitutes a waiver of its immunity from suit under § 504 of the Rehabilitation Act).

In order to prevail on a claim under either the ADA or § 504 of the Rehabilitation Act, Currytto "must show that 1) he is a qualified individual with a disability; 2) [the DOC] is an entity subject to the acts; and 3) he was denied the opportunity to participate in or benefit from [the DOC's] services, programs, or activities [or that the DOC] otherwise discriminated against him by reason of his disability." *Wright v. N.Y. State Dep't of Corr.*, 831 F.3d 64, 72 (2d Cir. 2016). The ADA defines "disability" as "a physical or mental impairment that substantially limits one or more major life activities." 42 U.S.C. § 12102(2)(A).

Currytto has plausibly alleged a discrimination claim under Title II of the ADA and § 504 of the Rehabilitation Act. I will assume at this stage that Currytto's multiple mental health diagnoses, including delusional disorder, schizoaffective-depressive disorder, and bipolar disorder, make him a "qualified individual" with a disability such that he satisfies the first element of a disability discrimination claim. *See Andrews v. Semple*, 2017 WL 5606740, at *5 (D. Conn. 2017) (assuming at initial review stage that plaintiff's bipolar disorder, depression, post-traumatic stress disorder, and paranoia constitute a disability under the ADA). I will also assume at this stage that his substance abuse disorder manifests in a way that substantially limits one or more of his life activities, and that the other inmates in the addiction services unit would also be considered qualified individuals as defined by the Acts. *See* 29 C.F.R. § 1630.3(a)-(b) (excluding "individuals currently engaging in the illegal use of drugs," from the ADA's definition of disability, but providing that "the terms disability and qualified individual with a disability may not exclude an individual who . . . [i]s participating in a supervised rehabilitation program and is no longer engaging in such use.")

As for the second element of the claim, it is well established that "[s]tate prisons fall squarely within the statutory definition of 'public entity' which includes 'any department, agency, special purpose district, or other instrumentality of a State or States or local government.'" *Pennsylvania Dep't of Corr. v. Yeskey*, 524 U.S. 206, 210 (1998) (quoting 42 U.S.C. § 12131(1)(B)).

Currytto also satisfies the third element by plausibly alleging that he was discriminated against because of his disabilities. He alleges that being forced to eat last deprived him of the benefits of the prison's nutritional program and meant that he did not have time to ingest adequate nutrition. He alleges that non-disabled inmates were given enough time to eat, and that his units were singled out to eat last because they housed inmates with disabilities. *See* Doc. #23 at 13, 40 (alleging that defendants initially selected the mental health unit to eat last because they were "disabled," "manageable," "yielding," and "deteriorated," and that defendants then forced J unit inmates to eat last because their unit was subject to more rules than others and so easier to control than units not focused on addiction services). I will assume at this stage that the substance abuse unit was subject to more rules—and therefore forced to eat last—because the inmates in that unit had substance abuse disorders and not for reasons unrelated to inmates' disabilities. Accordingly, I will allow Currytto's ADA and Rehabilitation Act claims to proceed as to the Department of Correction, and I will dismiss the claim as to all other defendants.[1]

### *First Amendment retaliation*

The First Amendment protects prison inmates from being subject to retaliation on the basis of an inmate's filing of a lawsuit, lodging a grievance, or engaging in other protected free

---

[1] To the extent that Currytto means to allege that requiring MHU inmates to wear pink and blue badges violates his rights under the ADA and Rehabilitation Act, Doc. #23 at 26-27, the facts alleged do not support an inference that this requirement was itself the reason that he was denied access to adequate food or otherwise discriminated against.

speech activity. In order to establish a claim for unlawful retaliation against First Amendment speech, a plaintiff must prove that he engaged in speech activity that is protected by the First Amendment and that a governmental defendant took adverse action against the plaintiff because of the plaintiff's protected speech activity. *See Burns v. Martuscello*, 890 F.3d 77, 84 (2d Cir. 2018); *Dolan v. Connolly*, 794 F.3d 290, 294 (2d Cir. 2015). A plaintiff must prove that he suffered an adverse action of sufficient magnitude that it would deter a similarly situated person of ordinary firmness from exercising his or her right to speech. *See Burns*, 890 F.3d at 93-94; *Wrobel v. Cty. of Erie*, 692 F.3d 22, 31 (2d Cir. 2012). The Second Circuit has "instructed district courts to approach prisoner retaliation claims with skepticism and particular care, because virtually any adverse action taken against a prisoner by a prison official—even those otherwise not rising to the level of a constitutional violation—can be characterized as a constitutionally proscribed retaliatory act." *Dolan*, 794 F.3d at 295 (internal quotations omitted).

Currytto alleges that a number of defendants retaliated against him after overhearing his conversation with Murphy, in which he told Murphy about not having enough time to eat his meals. But a verbal complaint "to correctional staff is not protected activity of the type necessary to support a retaliation claim." *Montgomery v. Dep't of Corr.*, 2017 WL 5473445, at *4 (D. Conn. 2017). Any retaliation claims arising from Currytto's conversation with Murphy are dismissed.

Currytto also alleges that on October 29, 201[8], 17 days after he had filed an administrative remedy request regarding the kickout practice, Cyr and Grant punished him by giving him even less time to eat his meal than other inmates in MHU. He also alleges that officers Grant, Williams, Murphy, and "John Doe(s) 2 or more" began staring and shaking their keys at him and calling him a sex offender after he filed a second administrative remedy request.

Filing a written grievance is a protected activity, and while Currytto does not directly allege that these defendants were aware of the remedy requests he had filed, "allegations that the adverse action was taken close in time to [a] plaintiff's protected conduct may serve as circumstantial evidence of retaliation." *Read v. Calabrese*, 2013 WL 5506344, at *3 (N.D.N.Y. 2013) (citing *Bennett v. Goord*, 343 F.3d 133, 138 (2d Cir. 2003)). Currytto also alleges that Grimaldi and Eason deliberately gave him only two minutes to eat on September 8, 2018, in retaliation for his having filed a complaint in federal court on August 18, 2018. He alleges that Grimaldi and Eason were aware of the complaint because Acanto "advises any potential staff members involved in litigation of complaints filed with the U.S. District Court and provides an advanced copy of the complaint." Doc. #23 at 47.

The question then is whether having mealtimes limited to two minutes on two occasions and being stared at and called names by officers in the hallway would deter a similarly situated person of ordinary firmness from exercising his or her right to speech. Insulting comments or a hostile manner, without more, are *de minimis* acts that fall "outside the ambit of constitutional protection." *Davis*, 320 F.3d at 343. But having two meals shortened to two minutes after complaining about months of 2-5 minute meals could plausibly deter a similarly situated person from exercising his or her right to speech. I will allow Currytto's First Amendment retaliation claims to proceed against Cyr, Grant, Williams, Murphy, Grimaldi, Eason, and the John Doe officers.

Although Currytto brings his retaliation claims under the First Amendment, his complaint can be construed to also raise claims of retaliation under the ADA and the Rehabilitation Act. Title V of the ADA "prohibits, *inter alia*, retaliation against any individual who has asserted rights under the ADA." *Sarno v. Douglas Elliman-Gibbons & Ives, Inc.*, 183 F.3d 155, 159 (2d

Cir. 1999). The same standards apply to a claim of retaliation under § 504 of the Rehabilitation Act as under the ADA. *See Treglia v. Town of Manlius*, 313 F.3d 713, 719 (2d Cir. 2002). To state a retaliation claim under either Act, a plaintiff must establish that "(i) plaintiff was engaged in protected activity; (ii) the alleged retaliator knew that plaintiff was involved in protected activity; (iii) an adverse decision or course of action was taken against plaintiff; and (iv) a causal connection exists between the protected activity and the adverse action." *Weixel v. Bd. of Educ.*, 287 F.3d 138, 148 (2d Cir. 2002) (internal quotation marks omitted). I will allow Currytto's ADA and Rehabilitation Act retaliation claims to proceed against the Department of Correction. *See Maioriello v. N. Y. State Office for People with Developmental Disabilities*, 2015 WL 5749879, at *12 (N.D.N.Y. 2015) (holding that "insofar as Plaintiff can state a claim under Title II . . . of the ADA, her Title V claim will not be barred by the Eleventh Amendment"); *see also DeCotiis v. Whittemore*, 842 F. Supp. 2d 354, 370-71 (D. Me. 2012) ("Where the underlying claim is predicated on alleged violations of Title II of the ADA, then the Title II abrogation of immunity is extended to ADA Title V retaliation claims.").

### Access to courts

Currytto also alleges that defendants prevented him from collecting evidence of the problematic mealtime practices. The Court interprets this as a claim that defendants limited his access to courts. "Prisoners have a constitutional right of access to the courts that may not be unreasonably obstructed by the actions of prison officials." *Tuttle v. Semple*, 2018 WL 1168583, at *3 (D. Conn. 2018) (citing *Washington v. James*, 782 F.2d 1134, 1138 (2d Cir. 1986)). "To state a claim for denial of access to the courts, a plaintiff must demonstrate that he suffered an actual injury—that is, he must allege that defendant's conduct deprived him or her of an

opportunity to press some nonfrivolous and arguable legal claim in court." *Ibid.* (internal

quotation marks omitted) (citing *Lewis v. Casey*, 518 U.S. 343, 353 (1996)).

Currytto alleges that Acanto forced him to limit his requests for the production of video

evidence not because the requests were actually excessive, but because he wanted to limit his

liability and thwart his attempts to exhaust his administrative remedies. Doc. #23 at 46-50. But

the exhibits Currytto has submitted along with the operative complaint show that at least eight of

his video preservation requests were granted. Docs. # 76, 79, 82, 84, 87, 114, 116, 134. Given

the frequency with which Currytto alleges that the problem he wished to document took place, it

was not unreasonable for Acanto to ask him to narrow his requests, and there is no indication that

he needed more video footage in order to make his claims in court. I will dismiss Currytto's

access-to-courts claim.

### Improper handling of grievances

Currytto alleges that his grievances were improperly handled by prison officials, who he

alleges rejected his grievances even though they were aware of the problem and also

"reinterpreted the evidence" he submitted in order to cover up "the practice failures in [the]

dining hall." *Id.* at 51. Because the Constitution does not require prison officials to create

administrative grievance procedures, the "failure to process, investigate or respond to a

prisoner's grievances does not in itself give rise to a constitutional claim." *Swift v. Tweddel*, 582

F. Supp. 2d 437, 445-46 (W.D.N.Y. 2008) (collecting cases); *see also Riddick v. Semple*, 731 F.

App'x 11, 13 (2d Cir. 2018) (prisoner's "claim that defendants violated his due process rights by

restricting his access to the prison's grievance procedures confuses a state-created procedural

entitlement with a constitutional right"). I will dismiss Currytto's claim regarding the way his

grievances were handled as there is no separate basis to support it.

### *Supervisory liability*

The complaint alleges that the kickout practice was a "custom, practice, policy," of the Department of Correction. Doc. #23 at 10. The Court construes this allegation as a claim that those defendants who are supervisors violated Currytto's constitutional rights by failing to properly train and supervise prison officials, even if they were not directly involved in the kickout practice. A plaintiff can succeed on such a claim if a supervisor is grossly negligent in supervising an officer who commits a constitutional violation or permits a custom that sanctions unconstitutional conduct to continue. See *Hernandez v. Keane*, 341 F.3d 137, 144 (2d Cir. 2003) (listing five criteria supporting a claim for supervisory liability). But "conclusory, unsupported allegations [of gross negligence or the existence of a policy] are simply insufficient to establish liability of supervisory prison officials under § 1983." *Parris v. N. Y. State Dep't of Corr. Servs*., 947 F. Supp. 2d 354, 364 (S.D.N.Y. 2013). Currytto has not alleged specific facts to support an inference that the supervisor defendants created or contributed to a policy or practice of depriving inmates of sufficient food.

Currytto also alleges that several of the supervisor-defendants were "on notice" of the kickout practice because they received his grievances or passed by the dining hall at kickout time. District courts in this Circuit are split on whether an official's review and denial of a grievance constitutes personal involvement in an underlying unconstitutional act. *See Young v. Choinski*, 15 F. Supp. 3d 172, 191 (D. Conn. 2014) (collecting cases). In general, courts have held that a defendant is not personally involved when a plaintiff alleges only that the defendant denied a grievance. *Ibid*. On the other hand, if a prison official receives a grievance for an ongoing violation that the official can remedy, the official personally reviews the grievance, and then responds to the grievance, the official may have been sufficiently personally involved to be

individually liable for the alleged constitutional violation. *Id.* at 191-92; *see also Ackridge v. Aramark Corr. Food Servs.*, 2018 WL 1626175, at *16 (S.D.N.Y. 2018).

Even if the kickout practice was an ongoing alleged violation that some of the supervisor defendants could have remedied after reading the grievances Currytto alleges he submitted to them, at best the law is not clearly established that a supervisory official violates the Constitution by erroneously denying a grievance appeal. Therefore, I must conclude that defendants not alleged to have personally participated in the practice are entitled to qualified immunity as to Currytto's claims for money damages. *See Poe v. Leonard*, 282 F.3d 123, 134 (2d Cir. 2002) (qualified immunity requires showing that official violated clearly established law and noting that, in the supervisory liability context, a court's focus must be on whether the law was clearly established both as to the underlying constitutional violation as well as supervisory liability doctrine by which the supervisor would be held liable); *Brown v. Semple*, 2018 WL 5619195, at *3 (D. Conn. 2018).

### State law negligence claim

The Court limits its review for purposes of 28 U.S.C. § 1915A to federal law claims. That is because the core purpose of an initial review order is to make a speedy initial screening determination of whether the lawsuit may proceed at all in federal court and should be served upon any of the named defendants. If there were no facially plausible federal law claims against any of the named defendants, then the Court would decline to exercise supplemental jurisdiction over any state law claims pursuant to 28 U.S.C. § 1367. *See also Nicholson v. Lenczewski*, 356 F. Supp. 2d 157, 165-66 (D. Conn. 2005). Because Currytto has asserted facially plausible federal law claims, the validity of his accompanying state law claim may be appropriately addressed in the usual course by way of a motion to dismiss or a motion for summary judgment.

CONCLUSION

The case will proceed as to plaintiff's ADA and Rehabilitation Act claims against the Department of Correction, as well as his Eighth Amendment deliberate indifference to serious medical needs claim against Williams, Murphy, Grant, Morgenstein, Cyr, Nothie, Horn, Talaga, Peart, Sanchez, Maeli, Grimaldi, Manning, Chapdelaine, and the John Doe officers and lieutenants. The case will also proceed as to plaintiff's First Amendment retaliation claims against Cyr, Grant, Williams, Murphy, Grimaldi, Eason, and the John Doe officers. Plaintiff's supplemental state law claim will proceed as well. All other claims are DISMISSED pursuant to 18 U.S.C. § 1915A(b).

The Court enters the following orders:

(1) **The Clerk shall** verify the current work addresses of defendants Williams, Murphy, Grant, Morgenstein, Cyr, Nothie, Horn, Talaga, Peart, Sanchez, Maeli, Grimaldi, Manning, Chapdelaine, and Eason with the Department of Correction Office of Legal Affairs, mail a waiver of service of process request packet, containing the Complaint and this Order, to each defendant at the address provided within **twenty-one (21) days** of this Order, and report to the Court on the status of those waiver requests on the thirty-fifth day after mailing. If any defendant fails to return the waiver request, the Clerk shall arrange for in-person service by the U.S. Marshals Service on the defendant in his or her individual capacity and the defendant shall be required to pay the costs of such service in accordance with Federal Rule of Civil Procedure 4(d).

(2) **The Clerk shall** send plaintiff a copy of this Order.

(3) **The Clerk shall** send a courtesy copy of the Complaint and this Order to the Connecticut Attorney General and the Department of Correction Office of Legal Affairs.

(4)     The defendants shall file their response to the complaint, either an answer or motion to dismiss, within **sixty (60) days** from the date the waiver forms are sent. If they choose to file an answer, they shall admit or deny the allegations and respond to the cognizable claim recited above. They also may include all additional defenses permitted by the Federal Rules.

(5)     Discovery, pursuant to Federal Rules of Civil Procedure 26 through 37, shall be completed by December 5, 2019. Discovery requests need not be filed with the Court.

(6)     All motions for summary judgment shall be filed by January 5, 2020.

(7)     Pursuant to Local Civil Rule 7(a), a nonmoving party must respond to a dispositive motion within twenty-one (21) days of the date the motion was filed. If no response is filed, or the response is not timely, the dispositive motion can be granted absent objection.

(8)     If plaintiff changes his address at any time during the litigation of this case, Local Court Rule 83.1(c)2 provides that plaintiff MUST notify the Court. Failure to do so can result in the dismissal of the case. Plaintiff must give notice of a new address even if he is incarcerated. Plaintiff should write PLEASE NOTE MY NEW ADDRESS on the notice. It is not enough to just put the new address on a letter without indicating that it is a new address. If plaintiff has more than one pending case, he should indicate all case numbers in the notification of change of address. Plaintiff should also notify the defendant or the attorney for the defendant of his new address.

(9)     Plaintiff shall utilize the Prisoner Efiling Program when filing documents with the Court. Plaintiff is advised that the Program may be used only to file documents with the Court. As local court rules provide that discovery requests are not filed with the Court, discovery requests must be served on defendants' counsel by regular mail.

It is so ordered.

Dated at New Haven this 9th day of May 2019.

/s/ ***Jeffrey Alker Meyer***
Jeffrey Alker Meyer
United States District Judge